I. The counsel for the appellants contended, upon the construction of the testator Robert Poole’s will, 1. that his wife was enti-titled to a third of all the estate real and personal left by the testator, clear of his debts, and that all the debts were charged on the residuum devised and bequeathed to the son ; *835 2. that she took an absolute estate in the third of the real, and of the slave property as well as the other personalty ; and 3. that in ascertaining- her third, the emancipated slave, and the two slaves and other chattels specifically bequeathed to her, were to be taken into account as part of the subject to be divided. These propositions, they said, presented questions of testamentary intention ; and the intention was to be gathered from the peculiar dispositions of the will. 1. As to the first, they said, it was not a question between a legatee of the personal and the dev-isee of the real estate, whether the personal should be applied to the discharge of the debts in exonoration of the real; in which case, it might be admitted that, without express words or plain intent to charge the debts upon the real estate, the devisee would have a right to require that the personal assets should be applied to the satisfaction of the debts : but here the question was, between a legatee and devisee of a specified part of both real and personal estate, and the legatee and devisee of the residue of the same. The testator gave his wife, “ besides *and above the use of one third of his real and personal estate, two men slaves with the horses and carts they drove, to be her own proper estate, and to be at her disposal,” also his carriage and horses and his furniture; and then gave his son “ all the residue of his estate, both real and personal, after payment of his just debts.” Thus, the debts were, in express terms, charged upon the residue; a provision, which, if the intent had been that the debts should be first paid, and one third of the surplus given to the wife and the residue to the son, would have been wholly unnecessary, and (if that construction should prevail) nugatory. To maintain such a construction, the words charging the residuum given to the son, with the debts, must be stricken out of the will. 2. Whatever was the subject of which the wife was to have a third part, she took an absolute estate in the third part devised and bequeathed to her. She took nothing as dowress or distributee under the provisions of the law ; therefore, the law could not be resorted to, in order to ascertain the estate she should take in the third of her husband’s real and personal property. She took as devisee and legatee under the will, so that the estate she was to take in the third, was to be ascertained by the will ; and the will giving her the third without qualification, the devise and bequest carried the absolute estate, if the husband had the absolute estate in him to dispose of. The gift of the use was equivalent to a gift of the subject itself. Butl. Fearne, 402-3. The words in the devise and bequest to the wife, “ to be her own proper estate and to be at her disposal,” referred to all the property before given to her; to “the third of the testator’s estate,” as well as “ the two men slaves and the horses and carts they drove.” Those words could hardly have been inserted only to indicate the interest the wife was to take in the two slaves and the horses and carts ; since the simple bequest of those chattels, without the addition of such words, would obviously '^have carried the absolute property; and this the testator was well apprised of, for the bequest of the carriage and horses and furniture to the wife, though certainly intended to give them in absolute property, had no such words superadded. But those words, though not necessary, were natural, proper and usual in wills, if they were used to ascertain the interest which the testator intended to give his wife, in the third part of his real as well as personal estate. The will should be understood as if read thus : “ I give my wife the third part of my real and personal estate, and besides and above, two men slaves &c. to be her own proper estate and to be at her disposal.” If the testator had intended to give his wife only a life estate in any part of the third, he would have expressed it, and then have given the remainder to the son. After giving the residue to the son, the testator limited over to others, in case he should die under age &c. the property and estate thereby given to him : why was there not any limitation of the remainder, or any executory devise, of the third given to the wife? Because he intended she should take the absolute estate in it all. 3. The wife was entitled to a third of the testator’s whole estate ; and unless it could be maintained (which could hardly be pretended) that the emancipated slave, and the two slaves and other chattels specifically bequeathed to her, were not part of the testator’s estate, this property must be taken into account, in order to ascertain the subject of which she was to have a third.
The appellee’s counsel answered, 1. That, when the testator gave his wife a third of his estate, he gave her a third of the estate which he had a right to dispose of : his estate, especially his personal estate, was, in truth, no more than the surplus after payment of his debts. In giving her specific legacies “besides and above one third of his real and personal estate,” he had reference to the provision which our law made for a widow, independently *of her husband’s will; namely, dower of his real estate, and, subject to his debts, a third of his slave property for life, and of his other personalty absolutely; and he intended to give her the two men slaves &c. in addition to the provision which the law would have given her. Neither did the testator charge the residue given to the son, in exclusion of the third given to the wife, with the payment of his debts : as he had, in effect, given the wife a third of his estate after payment of his debts, so he gave his son the residue “after payment of his debts.” Those words inserted in the devise and bequest to the son, only served to indicate the estate which was to be divided between the wife and the son ; the estate, namely, which should remain after payment of his debts. They cited Reed v. Addington, 4 Ves. 575, and relied on it as directly in point and conclusive. There, the testator gave his wife the third part of all his property that should become due to him after his decease ; then gave several legacies ; and “as to all the rest, residue &c. of his estate and effects &c. subject to the payment of all his debts, funeral expenses and legacies,” he gave the same to two trustees, upon trust that they should get in the residuary estate, and afterpayment of his debts, funeral expenses and legacies out of it, invest the same in the funds, for the benefit of three legatees. The wife claimed a third *836 of the clear personal estate of the testator at the time of his death, discharged from the debts, funeral expenses and legacies. But the court held, that the fund disposed of, was the fund after payment of debts ; and that the wife was entitled to a third of the personal estate after payment of the debts; but that the legacies were not charged upon that third, but were to come out of the resi-, due. 2. They said, that supposing their argument on the first point correct, it went far to dispose of the second. If the testator, in giving his wife a’third of his estate real and personal, intended to give her by his will, what the law would *have given her independently of the will, then he gave her a third of his real estate for life, a third of his slave property for life, and a third of his other personalty in absolute property. Besides, the testator had marked the difference between the interest she was to take in “the third part of his real and personal estate,” and that which he intended to give her in the “two men slaves and the horses and carts they drove,” by adding, that those specific legacies were “to be her own proper estate and to be at her disposalfor those words were, in their collocation, applicable only to the specific legacies, and were in the testator’s mind, without doubt, so applied: and being so applied, they excluded the idea, that the wife was to take the third part of the testator’s real and personal estate, before given her, in absolute property. The remainder of the estate given to the wife for life, was part of the residue given to the son and his heirs, and was as much subject to the executory limitation, in the event of his son dying under age and without issue, as any other part of the residue given to him by the will; so that no ■ argument could be drawn from that provision, to sustain her claim to an absolute estate in the third given to her.
3. As to the last point, they remarked, that the defendants had not insisted upon any such claim in the account rendered by themselves, and settled before the commissioners of the hustings court of Norfolk in September 1808 ; "they did not present the point in their answer in this cause ; they did not present it to the commissioner of the court of chancery when the accounts were before him, or to the court itself by any of their numerous exceptions to the reports. It was presented here, for the first time ; and it came too late. If it had been presented to the court below, it might have been obviated : it might have been shewn, that the emancipated slave, and the two slaves bequeathed to the wife, were long since dead, perhaps that they had died before the testator, and that the other chattels bequeathed *to her were of trivial value. She ought to have divided the personal estate, a's well as the real, between herself and her son, as soon as the testator’s debts were paid, and the administration closed, and in making that division her rights would have been ascertained; but she made no division. She never returned any inventory and appraisement of her testator’s estate ; and so, by her own fault, she deprived the court of the means of ascertaining her rights in the particular wherein her counsel here complained of injustice done her
Johnson, in the reply, said, as to the last point, that it was a question of law upon the construction and effect of the testator’s will, under which both parties claimed, and claimed whatever they were respectively entitled to ; and it was not necessary, that the defendants should have set forth their construction of the will in their pleadings, or brought such a point to the notice of the court by exception to the reports. Proof abounded in the record to shew, that it could not have been, obviated in the manner suggested, or in any manner. And though the court below might not have seen the point, and therefore might not have intended to decide it, yet it was, in effect, decided by the decree, and erroneously decided, to the injury of the appellants. In the argument of the first point, he commented on the case of Reed v. Addington, cited for the appellee ; questioned its correctness and authority, and denied its application to this case. He said, the argument was not reported ; Lord Ross-lyn gave no reason for his opinion ; it was not founded on any previous adjudication or authority of any kind ; it had not been followed in any subsequent case; nor had it ever been approved by any jurist. Indeed, there had never been, any mention of it that he could find, except by Hovenden in his note on the casé, in which he referred to another note on the case of Howse v. Chapman, 1 Eov. Supp. 3S0, 351, and, taking the two notes together, it was very difficult to ascertain what the annotator *supposed was the reason of the decision, or the precise point which was decided. However, the case stood alone. And whatever was the ground of the decision, and whether it was right or wrong, he said, there was a material difference between that case and this. There, the testator was disposing of personal estate only. In this case, the testator, in one and the same sentence, gave his wife a third of his real and personal estate : he meant to give her the same proportion of the one as of the other : and as he meant to give her a third of the real estate he held at his death, not charged with his debts, so he intended to give her a third of his personal estate likewise clear of his debts. This was put beyond doubt by the consideration, that the third of the real estate given to the wife, was nowhere and nowise charged with debts : whereas the devise and bequest to the son were of the residue of his estate, both real and personal, after payment of his just debts, in "express terms; which was, unquestionably, a charge of the debts upon the residue of the real estate, and, by consequence, upon the residue of the personal. [Tucker, P., mentioned the case of Overton & ux. v. Maben, 10 Leigh 609.] Johnson said, that case was decisive of the point, that the emancipated slave and the specific legacies to the wife, in this case, were to be taken into account in ascertaining the subject of which the wife was to have a third; but as to the questions, whether the wife was to take a third clear of debts or only a third of the surplus after debts paid, and what estate she was to take in the third, it decided nothing. There, the testator Maben, *837 after directing- that his real estate, his slave property, his household furniture and his stock of goods on hand, should all be sold, said - “In addition to what the law allows my wife, I give her my carriage and horses,” and three slaves, by name. The widow claimed that which the law would have allowed her, if the whole property had been at the testator’s death, as he directed it should be *afterwards, converted into money ; that is (as her husband left no children) an absolute estate in a moiety of the real property, and of his slave x)roperty as well as of his other chattels, or of the proceeds of sales thereof. The court held, that she was only entitled to that which the law allowed her of her husband’s property, real and personal, in its existing condition at the time of his death ; namely, dower (or one third for life) of his real estate, half of his slave property for life, and half of his other personalty in absolute property : and that if she consented to the sale of the real and slave property, she would be entitled to the same proportions, and to the same estate, in the proceeds of the sales thereof. The decision turned upon the consideration of the testator’s words “ what the law allows my wife,” and of the law referred to, which only made provision for a widow out of the estate her husband left in kind. Those emphatic words were wanting in our testator’s will ; nor were there any equivalent words. If this testator had given his wife specific legacies “ besides and above her thirds of his estate real and personal,” Overton v. Maben might have been in point; the widow’s thirds being the phrase in common use, to express the provision which the law made for widows out of their husband’s estates. But the language of this will was never used to express the same meaning.
II. In the case of Newton v. Poole, the appellant’s counsel said, 1. That as the slaves of the testator Robert Poole had never been divided between Newton’s wife and his ward, though he held the double character of executor of the testator in right of his wife the executrix, and of guardian of the appel-lee, all his transactions in receiving the hires -of the slaves, and in making sales thereof, clearly belonged to his executorial character, and ought to have been brought into his exec-utorial accounts; and the court below erred in overruling his '^exception to the charge thereof to him in his guardian’s account. 2. That as the houses of his ward must have required occasional repairs, proof that he purchased materials proper for such repairs, and his own oath (upon examination before the commissioner, under the order of the court) that the materials were applied to the purpose of such repairs, were sufficient to entitle him to a credit for the price he paid for the materials. It could not be necessary, that he should designate the particular houses in the repairs whereof the particular materials were used ; since all the houses, without doubt, required frequent repairs, so that the discrimination would have been useless, and hardly practicable. The court below erred in overruling Newton’s exception on this point, and yet more in the instruction it gave the commissioner, that he should be held to proof, by the testimony of disinterested witnesses, of the actual application of the materials to the purpose ; which, in effect, excluded all circumstantial evidence however strong.
The appellee’s counsel answered, 1. That as Newton was personally liable for the hires and for the proceeds of sales of the slaves received by him, or rather for his ward’s proportion thereof, and liable for the same amount in whichever of his two characters he should be charged, it was immaterial, whether he was charged with these moneys as executor or as guardian : and as no substantial injustice was done him by charging him as guardian, even if, in point of form, he ought to have been charged as executor, such an error was no ground for reversing the decree. 2. That it was the duty of the guardian to keep regular accounts, and regular vouchers ; and the only question was, whether he should be allowed to supply the defect of vouchers by his own oath.
III. In the case of Newton and wife v. Poole, the counsel for the appellants maintained, 1. That the first instruction given by the court to the commissioner, in *its interlocutory decree of February 1829, was erroneous. They said, it was contrary to principles now settled by repeated adjudications of this court — That accounts of executors or guardians, audited and reported by commissioners of the court to which such fiduciaries are required to render such accounts, are to be taken as prima facie evidence; that though such audited accounts are liable to be surcharged and falsified, the burden of proof lies on the party complaining ; and that if proved to be unjust in ever so many particulars, they are yet prima facie evidence as to all items not so impugned. Nor were such audited accounts to be regarded merely as stated accounts : their effect depended on the consideration that they have been settled by a tribunal provided by law for the settlement thereof. They cited Anderson & al. v. Fox & al., 2 Hen. & Munf. 245, 259-261 ; Carr’s ex’or v. Anderson, Id. 361; Atwell’s adm’r v. Milton, 4 Id. 253; M’Call v. Peachy, 3 Munf. 288 ; Burwell’s ex’ors v. Anderson adm’r, 3 Leigh 348 ; Garrett ex’or v. Carr & ux., Id. 407 ; Sherman adm’r v. Christian, 9 Id. 571, and the statute concerning guardians &c. 1 Rev. Code, ch. 108, § 7, p. 407, directing the settlement of guardians’ accounts, and declaring the effect of such settlements. Whatever was the ground upon which the court thought it proper to instruct the commissioner to reject the audited accounts of September 1808 as prima facie evidence, there was nothing in the case to justify such an instruction. If the court proceeded on the ground, that the audited accounts were entirely discredited by the number and nature of the items of surcharge and falsification, which the plaintiff succeeded in establishing, the court misunderstood the rule of law which held such accounts prima facie evidence : the rule was, that they are prima facie evidence, notwithstanding that they are liable to be surcharged and falsified, and corrected in all particulars in which they are shewn to be unjust. And if proof of ^surcharge and falsification should be allowed to prevent the application of the rule, hardly a case would be found in practice to which it could be applied ; since there was very seldom an *838 account of the kind that was not liable to be surcharged and falsified in some particulars, more or less, according to the care and skill of the fiduciaries in keeping their accounts, and the skill of the auditors in stating them. If the court thought the instruction proper, because, in its opinion, the errors found in the accounts were justly imputable to wilful frauds prac-tised by the parties, whereby they deceived the auditors; they said, the evidence did indeed prove their want of care, and yet more their want of skill, in keeping such accounts, from which grievous injury had resulted to themselves ; but of any wilful fraud, they submitted, there was no proof whatever to convict them. (That, however, was a mere question of fact, the argument of which consisted in an examination of the evidence.) But suppose the actual frauds so recklessly imputed to Newton and wife (or rather, for the most part, to Mrs. Newton) had been proved upon them ; that would not have justified this sweeping instruction to the commissioner, to reject the audited accounts entirely —to call for new proofs even as to items that were no wise impugned — unless it had been also shewn, that the auditors who settled the accounts were corrupt and partial; that they were apprised of the frauds intended by the parties, connived at and lent their aid to support them. Now, there was no evidence, upon which the character or conduct of the auditors could be impugned. 2. The third and fourth instructions were equally erroneous and injurious to the appellants. The abstract principle of law as to the consequences of a “confusion of goods” to the party who confounds them, upon which the court founded those instructions, was inapplicable to the case. There was no confusion of goods. The court supposed, that the *bricks already made, which the testator Robert Poole left on hand when he departed for the West Indies in March 1803, were alone tobe accounted for as part of his estate ; and that those which his wife began to make during his life, but did not complete till after his death, were her own property : and the supposed “confusion of goods” consisted in her confounding her testator’s bricks with her own. But she did not engage in the brick-making business on her own account, to be prosecuted at her own expense, and at her own risque of profit or loss. She commenced it as agent of her husband, and under his positive instructions to her to resume it without delay and prosecute it; and though she did not and could not complete what she began during his life till after his death, all her transactions in the brick-making business were on account of her husband and his estate; so that the bricks he left on hand, and those she made, were all to be accounted for as assets of his estate, and her whole outlay, and all the expenses she incurred, from beginning to end,were proper charges against his estate. ' Why, then, was this “confusion of goods” now imputed to her ? why was a discrimination between the two parcels of bricks required? Only, in the first place, to justify the inferences from her confusion of them, that the burden of proof lay on her to shew how many she had made, and that she, as “the party by whose act the confusion of property was made, should lose, if any loss should be sustained by either party:” and, secondly, to lay a foundation for the fourth instruction, — that if she should not adduce satisfactory evidence of the quantity of bricks made by her after her testator’s death, his estate should be credited with one half of the proceeds of her sales of bricks after his death; clear, of course, of all expenses incurred by her in her brick-making business. She had made no such discrimination at the time ; the auditors in 1808 had confounded the two pai-cels of bricks, credited the testator’s *estate with the whole, and charged it with all the expenses she incurred in her operations ; and it was next to impossible she should be able now to adduce satisfactory evidence on the subject. And, in the absence of such proof, the court deemed it fair to assume, that one half of the bricks she sold were left on hand by her husband ; and that the other half only were made by her; and made of her own accord, on her own account, at her own charge and risque of profit or loss. Thus, by a misapplication of a principle of law, the court, in effect, ascertained a state of facts, whereby the opinion of the court, that “she should lose, if any loss were to be sustained by either party,” was carried out into its practical consequences.
The counsel for the appellee premised, that, in the accounts actually taken and reported by the commissioner, upon which the final decree of the court was founded, no injustice had been done the appellants in consequence of the instructions of the court which their counsel complained of: the instructions seemed, indeed, .to have been forgotten; the audited accounts of September 1808 had been corrected only so far as they were surcharged and falsified ; and the brick account, and every matter that appertained to it, had been stated upon actual evidence. And to shew this, they referred to and examined the commissioner’s reports. But they contended, that the instructions were right. 1. As to the instruction, that the audited accounts of September 1808 should not be received even as prima facie evidence, but the whole account should be stated de novo : they admitted the general rule, that such accounts are to be regarded prima facie as correct, liable to be surcharged and falsified by the party complaining of them; but they said, that rule had never been, and could never be, applied to a case, in which the party who relied on the audited accounts, was shewn to have been guilty of wilful injustice — of such and so many overcharges and ^omissions of credits, as could only be imputed to fraudulent design ; orto a case, in which, if corruption and partiality was not proved upon the auditors, the errors and injustice of the accounts they reported were so palpable, that they could only be accounted for upon the supposition of that gross negligence which was as injurious to the other parties interested in the accounts, as actual corruption could be ; or to a case, in which the fiduciaries who rendered the accounts had never returned any inventory and appraisement of the estate to be accounted for, whereby the auditors could test the accuracy of the accounts they rendered and submitted to examination. *839 (As to the gross negligence imputed to the auditors, and the actual frauds imputed to Newton and wife, chiefly to Mrs. Newton, these were questions of fact, which were argued on the evidence, and the affirmative as strenuously maintained on the one side, as they were denied on the other.) Supposing the fraud imputed to Newton and wife proved; such fraud, they insisted, took away all credit from the audited accounts, and deprived them of all benefit from the use thereof as evidence : such ex parte audited accounts could not stand higher than stated accounts inter partes ; as to which, if either party was convicted of fraud, the whole accounts were opened. But, however, the charges of fraud against the appellants, and of negligence against the auditors, and the effect of those charges if just on the credit of the audited accounts, might be controverted, the fact that no inventory and appraisement of the estate was returned to the court, or laid before the auditors, was incontestable and certain; and that fact alone, they said, sufficed to exclude the audited accounts as evidence. The making and returning such an inventory was an essential part of the duty both of executors and guardians, which was positively enjoined by law, and they were sworn to perform. 1 Rev. Code, ch. 104, § 35, 44, 45, p. 383-6-7, ch. 108, § 7, p. 407. Then, *what was the effect of the omission of that duty upon the audited accounts of these fiduciaries? Tucker, J., in his opinion in Anderson & al. v. Pox & al. was the first judge of this court who stated the rule, that these audited accounts are to be taken as prima facie evidence of the several charges and credits therein contained, liable to be surcharged and falsified by any person interested therein, if capable of adducing satisfactory evidence to that purpose : and after stating- the rule, he said, that the party seeking to surcharge and falsify an account of the kind, ought “to call for the inventory, appraisement and account of sales of the estate, together with the vouchers in the hands of the executor.” The same judge, in Atwell’s adm’rs v. Milton, after adverting to the unanimous opinion of the court in Carr’s ex’ors v. Anderson, that an inventory and appraisement which did not appear to have been signed by the executor nor submitted to the court and ordered to be recorded, was not proper to be admitted as evidence, and after referring to the opinion he had expressed in Anderson & al. v. Pox & al. as to the effect of an audited account, said, “I beg leave to add a further reason in support of that opinion. By our law both executors and administrators are bound to make a true and perfect inventory of their testators’ or intestates’ estates, and to exhibit the same, when required, to the court, and to make a just and true account of their actings and doings therein &c. The executor may certainly, without being required, exhibit his accounts to the court for settlement, because, being bound by obligation under a heavy penalty to do so when required, he ought to be permitted to do so without being required. The court are to proceed to have the accounts duly examined and settled. To this end, the inventory and appraisement (when the latter is required) must be considered as preliminary requisites, and necessary vouchers. And when the court has referred them to commissioners to examine, state xand settle, who report, that they have examined the account and vouchers to them submitted, and closed the account, which is afterwards certified to have been examined and allowed by the court, and ordered to be recorded ; can there be doubt that a copy of the account so exhibited, examined, allowed and admitted to record by the proper tribunal, would prima facie be so far conclusive evidence in favour of an executor, in an action brought upon his official bond, as to shift the burden of proof, as to any thing which might surcharge and falsify such account, from the executor to the plaintiff ? I conceive not” &c. And Roane, J., in the same case, held the audited account prima facie evidence, because, though it was not expressly stated that the inventory of the estate was produced before the auditors, yet, that being the natural course of business, it should be intended. Thus, from the very authorities which laid down the rule, that audited accounts were to be taken as prima facie evidence for the executor, it appeared that the reason of it was, that an inventory of the estate was “ a preliminary requisite and necessary voucher” to be laid before the auditors. And it was indeed most manifest, that without such a document, the auditors would have no materials upon which they could settle the accounts ; no means of ascertaining, whether the accounts rendered by the parties were fair and full accounts or not. Therefore, the fact, in this case, that no inventory of the testator Poole’s estate had ever been returned to court, that none was laid before, or called for by, the auditors, that in truth none was pretended to have been made at any time or in any form, was alone sufficient to justify the instruction given by the court to the commissioner to disregard the audited accounts as evidence. 2. The want of the inventory was also an essential consideration in the enquiry, whether the third and fourth instructions were correct: it was the principal consideration on which the court founded those instructions. The confusion xof the bricks left on hand by the testator with those made by the executrix, left it uncertain how many she had made; and while that uncertainty remained, it was impossible to know whether her charges for expenses incurred by her in her brick-making operations, were reasonable or exorbitant, real or pretended. And it was in this way, that this confusion of goods produced by her own neglect to return an inventory of the bricks left by her testator, worked, as she used it, to her own advantage ; whereas the court thought, and rightly thought, that it ought to operate to her loss rather than to the prejudice of the plaintiff. Yet it gave her the opportunity of ascertaining by oral evidence, the true state of facts, which the inventory she ought to have returned; would have shewn. In the absence of any evidence on her part, the court did not arbitrarily assume, but thought it a fair inference from the evidence, that one half the bricks sold by the executrix, had been made and left on hand by the testator, and therefore directed that the es *840 tate should be credited with half of the proceeds of her sales of bricks ; wherein (as they said, and endeavoured by a minute examination of the evidence to shew) the court did indeed err, but the error was grievously injurious to the plaintiff.
Johnson, (in reply to the argument against receiving the audited accounts as prima facie evidence, founded on the circumstance that no inventory and appraisement of the estate had been returned,) called the attention of the court to the case of M’Call v. Peachy’s adm’r; where, though the administrators had returned an inventory, it was acknowl-edgedly imperfect, in omitting the important items of the debts due their testator at his death, which constituted the main point in controversy, yet it was held, that they were not chargeable with more on that account, than the debts which should be proved to have been collected by them or lost by their negligence, and that the audited accounts, stated in the absence *of a perfect inventory, should be taken as prima facie evidence.
I. In the case of Newton v. Poole, CABKLL, J., pronounced the opinion and decree of the court — That, no division having been made of the slaves which belonged to the estate of the testator Robert Poole, and no accounts having been taken, to shew what proportion the appellee would be entitled to of the slaves of that estate, it was wrong to charge the appellant with the hires of the slaves or of any of them: those hires belonged to the executorial, and not to the guardianship accounts, and ought not to be settled in this suit, but in the other suit of Poole v. Newton & wife — That, on the same ground, it was improper to bring into the accounts in this suit, either as debits or credits, any portion of the proceeds of sales of any of the slaves of the estate of the testator Robert Poole ; those proceeds of sales being a fit subject for the suit against Newton and wife, and not for this — That, therefore, the court below erred in overruling the appellant’s exceptions on those points. And that this court was also of opinion, that, in settling the appellant’s accounts of the rents and disbursements of the real estate, the court below erred in directing, that he should not be credited for articles satisfactorily shewn by disinterested testimony to have been purchased by him, and to have been necessary and proper for the lawful purposes of the real estate, unless it should be also proved by like testimony, that they were in fact applied to the purposes of the estate ; this court being of opinion, that when such articles were thus proved to have been purchased by the appellant, his own oath that they were applied to the purposes of the estate, should entitle him to credit for them, whether they be of large or small amount, and although he should not be able to designate the particular tenement to which they were applied.
*Therefore, the decree, as to so much thereof as was above declared to be erroneous, was reversed, with costs &c. and as to the residue thereof affirmed : and the cause was remanded to the circuit superior court of James City, for further proceedings according to the principles of this decree.
II. In Newton & wife v. Poole, TUCKER, P., delivered the opinion of the court. He said- — The cases before us are of extreme hardship to the appellee, to whom it is obvious from the records, that large sums are due, in his character of ward and distributee, although his recovery has hitherto been prevented, and may be still further delayed, by the complicated situation of the accounts, and by the embarrassments, which, in cases of this description, are so easily thrown in the way of a final decree. In such cases, it cannot be improper for the court of chancery, where it is apparent that, under any aspect of the case, an indisputable amount is due to the distributee, to make an interlocutory order for the payment of it, instead of tying up for a quarter of a century what is beyond dispute, merely because there may be matters of minor importance unsettled between the parties. In this case the appellee’s father died in 1803. He himself came of age in 1823, and filed these bills against his own mother and father-in-law, in the character of executors and guardians; and in May 1835, a final decree was pronounced from which the defendants appealed, and the cause has lingered here ever since. So that, at fourty years of age, the appellee has not yet received one cent of that portion of his patrimony which has accumulated in the hands of his guardian. Such a state of things is a reproach upon the justice of the country. To avoid, in some degree, the crying hardship of the law’s delay, it is certainly desirable, that the court of chancery should, in such cases, make such interlocutory decrees as I have indicated.
*In proceeding to settle the contested questions between the parties, the first that presents itself is as to the rights of Mrs. Newton in her deceased husband Robert Poole’s estate. And here we are agreed, that she is entitled to one third of the estate, real and personal, precisely as the law would give it to her, and to the slaves Sam and George and the other specific legacies, in addition thereto. In other words, the widow is entitled under this will, to one third after payment of debts, and to the specific legacies besides; and, in estimating that third, the specific legacies and the emancipated slave are to be taken as part of the dividend, so that she will have a third of the whole estate after payment of the debts. This is the principle on which the court proceeded in Overton & wife v. Maben.
It next becomes necessary to decide, whether the court properly forbade the introduction by the appellants of the administration accounts, settled in September 1808, under the orders of the borough court of Norfolk, as prima facie evidence in their behalf. And we are of opinion, that the instruction upon that subject was erroneous. It has long been the established rule of our courts, that settlements of administration accounts made by auditors appointed by the courts of probat, when duly returned, approved and recorded, are admissible evidence for the executor, and are to be taken as prima facie evidence of the several charges and credits, subject to be surcharged and falsified by any person interested. The decisions to that effect (cited at the bar) rest, mainly, upon the long established practice of the *841 country, and are somewhat sustained by the principle, that where the law entrusts the performance of certain duties to commissioners, it will be presumed they have properly fulfilled them, till the contrary is proved. Stark. Ev. part 2, § 49, p. 173 ; Id. part 4, p. 263 ; Moody v. Thurston, 1 Stra. 481. Guardians’ accounts stand upon the same footing' by statute. The order, then, in this '-'case, was erroneous, unless there was something from which we could infer falsehood and unfairness on the part of the commissioners. What requires us to disregard the rule, which, until the contrary be proved, attributes verity to their certificate, that the items of charge and credit in those accounts were sustained by vouchers or sufficient evidence ? The objections which have been made, very sufficiently indeed prove surcharges and falsification ; and, so far, the account must be corrected. But such proof does not operate to discredit the whole account; for, if it did, no account could stand, as there is perhaps none in which some error or omission may not be found. It is not, therefore, enough to shew that there has been no inventory ; or that great errors appear, or that the executor has even taken an unfair advantage; for though such evidence unquestionably would affect the general result, and forbid us to take the amount reported to be just, yet so long as the commissioners are unassailed, the verity of their certificate of the proof of the items of the account must be allowed, unless controverted by evidence. Por the audited account does not, as has been erroneously supposed, stand upon the footing of a stated account between the parties. The latter rests upon the supposed adjustment between the parties themselves ; and if there be fraud, it is of course void in toto. The other rests upon the supposed integrity of an impartial tribunal, and is only to be corrected so far as it is proved to be erroneous, unless corruption in the tribunal itself can be established: for where the law authorizes any person to make an enquiry of a judicial nature, and to register the proceedings, the proceedings so registered are not only to be presumed to be true, but they are generally held to be the only legitimate medium to prove the result. Stark. Ev. part 4, p. 1043. As in this case ; although the audited account is not conclusive evidence against those not parties to it, to establish the amount and justice of *the executorial disbursements, yet the fact that a particular item was proved by a voucher, or that all the items were proved by vouchers, depends upon the certificate of the persons entrusted, and must therefore be taken as true unless disproved. Therefore, the circuit superior court erred in refusing to permit the audited account to be received as prima facie evidence before its commissioner.
As to the instruction upon the abstract principle about the confusion of goods, we are of opinion, that that principle has nothing to do with the case. The whole of the bricks, whether made before or after the testator Poole’s death, belonged to his estate, and ought to be credited to it; and the whole ■of the expenses in his lifetime, or since his death, should, in like manner, be charged to the estate, the net balance constituting, in fact, the assets of the testator, chargeable with debts and distributable among those entitled.
These principles being settled, the result would prima facie require a reversal of the decree. But the appellee’s counsel contend, that if upon a full examination of the whole record, the amount decreed does not exceed what is due to the plaintiff, the decree should • be affirmed, although the court below may have arrived at the result in an irregular manner. As a general principle, this may be admitted; but the enquiry still recurs, whether such a coarse can be safely adopted in this complicated case, depending upon masses of evidence, documentary and oral, and requiring detailed explanations of the numerous exceptions filed in the cause ? We think not ; and the rather, as the accounts may assume a very diiferent aspect, when stated by a commissioner, upon a recommitment with instructions to receive the audited accounts as evidence, and to adjust the brick account, and the legacies and distribution, upon the principles above mentioned. We therefore decline going into an examination of the exceptions in the second case, as that examination *could not end in any profitable result, and might conclude matters which ought to be left open to the operation of the evidence afforded by the audited accounts.
The decree of this court declared, that there was error in the said proceedings and decree of the court below, in the following particulars : 1. In the instructions given to the commissioner by the interlocutory decree of February 1829, that in taking the accounts the defendants should not be permitted to offer and use as prima facie evidence the accounts of their transactions rendered to the hustings court of Norfolk, but that the accounts should be taken de novo without benefit to them from those accounts ; this court being of opinion, that it is the well established rule, that ex parte settlements of administration accounts by commissioners appointed by the court which granted probat or administration, and passed by such court, are to be received prima facie as evidence in favour of the executor or administrator, subject nevertheless to be impugned, surcharged and falsified by the opposite party : 2. In the application of the principle of law as to the confusion of goods, to the ascertainment and adjustment of the brick account ; this court being of opinion, that the whole of the bricks, whether made before or after the testator Poole’s death, should be taken to have belonged to his estate, and ought to be credited to it, and that the whole of the expenses in making them, whether in his lifetime or since his death, should in like manner be charged to his estate ; the net balance constituting, in fact, the assets of the testator chargeable with debts, and distributable among those entitled : 3. In the construction of the will of Robert Poole ; this court being of opinion, that the widow was entitled first to her specific legacies in absolute property, and, in addition thereto, to one third of the real and personal estate of the testator after payment of debts ; the real estate *and slaves (if any) in her share to be held for life, and the other personalty in absolute property ; and that, in estimat *842 ing her third, the specific legacies and the emancipated slave are to be taken as a part of the dividend, so that she will have a third of the whole estate including them, in addition to her specific legacies. And the court being of opinion, that further decision by this court upon the various exceptions and other points in the cause, will lead to no profitable result, as it is impossible to see how far they may be affected by the opinions upon the questions above decided, waived any such further decision. Therefore,' decree reversed, so far as it was above declared erroneous, with costs &c. And cause remanded to the circuit superior court of James City, to be finally proceeded in according to the principles declared in this decree.